Newman, Circuit Judge, dissenting.
Infant E.O. was described by his pediatrician, at his 6-month well-baby visit on April 9, 2009, as developing normally, temperature 97.4º F. He was given the third dose of the DTaP 1 vaccine. At about 11:30 that night he was found convulsing and with a fever. He was rushed by ambulance to the emergency room, where a temperature of 101.3º F was recorded. By August 2009 E.O. had six observed seizure episodes. By the following year seizures were occurring daily, and normal mental and physical development were affected.
E.O.'s parents obtained genetic analysis of both his and their DNA. E.O. was found to have a mutation of the SCN1A gene, which has become associated with "severe myoclonic epilepsy in infancy," also called "Dravet syndrome," as characterized by Dr. Dravet in 1978.[2] The Petitioners duly sought the benefits of the Vaccine Act, but the Special Master held that since E.O. has this genetic mutation, any vaccine relationship is irrelevant and the Vaccine Act does not apply. My colleagues now affirm this ruling.
I respectfully dissent, for this is a classic case of vaccine injury, within the purpose, policy, and text of the Vaccine Act. Advances in scientific understanding of why some infants experience vaccine-related seizures and their tragic consequences, support the statutory plan.
DISCUSSION
It was known that about one half of one percent of apparently normal infants experience a serious adverse reaction to vaccine. See S. Hrg. 98-1060, at 21 (1984).
*1365 Vaccine injury of healthy infants has long been believed to be affected by some aberration within the infant; advances in genetic science now are enabling exploration of such aspects.
The Special Master held that E.O.'s "destiny" is to be mentally and physically disabled because of his SCN1A gene mutation. The Special Master held that it is irrelevant that E.O. experienced a classic Vaccine Act injury, and irrelevant whether the vaccine triggered or contributed to his ensuing disability. The Special Master discarded the studies that show at least half of the persons found to have the SCN1A mutation never manifest Dravet syndrome. The Special Master deemed it irrelevant that 20-30% of persons afflicted with Dravet syndrome do not have the SCN1A mutation.
The reported studies found that vaccination within the first 6 months of infancy almost always produced seizures and led to Dravet syndrome for infants having the SCN1A mutation, while vaccination after 12 months never produced seizures and Dravet syndrome. The studies show that both vaccination and the mutation have a role in Dravet syndrome. Nonetheless, my colleagues hold that if a genetic relationship to the injury can be found, the triggering role of vaccination is irrelevant.
Science is at last providing answers to why some infants manifest a severe reaction to vaccination. However, these are the infants for whom the Vaccine Act was enacted. Instead, HHS and the courts now exclude these infants from the Vaccine Act-in contravention of the statute and the legislative purpose.[3]
THE EVOLVING SCIENCE OF VACCINE INJURY
HHS acknowledges that E.O.'s 6-month DTaP vaccination produced an immediate reaction of seizures and fever, squarely within the statutory vaccine injury.[4] However, HHS insists that vaccine injury is irrelevant if the SCN1A mutation is present.
The Petitioners cite several scientific articles that report studies of the role of vaccination when the SCN1A mutation is present. These articles illustrate evolving understanding, drawing on the capabilities of DNA analysis. I have placed these publications in chronological order, for they illustrate the growth of this area of scientific knowledge, as well as the continuing uncertainties.
1.
M. Nieto-Barrera et al., Severe Myoclonic Epilepsy in Infancy. An Analytical Epidemiological Study , 30 REV. NEUROL . 620-24 (2000).
The authors report their study of patients afflicted in infancy with Severe Myoclonic *1366 Epilepsy (SMEI, referred to as "Dravet's syndrome" by the early 2000s). The article recites the history of vaccine-related convulsions, and traces the appearance and effects of infant myoclonic epilepsy. The authors state:
Our study emphasizes, however, the high frequency in which the first convulsion is related with the DTP vaccination (six times with the first dose, eight with the second and two with the third), [a] fact that we consider, with discrete reservations, something more than a coincidence. The relation between the vaccine DTP and the convulsions has been discussed extensively. It is considered by some as mere coincidence etárea, is estimated that the majority of the seizures that follow to the pertussis vaccination are associated with the fever ....
J.A. 1197 (internal citations omitted). The authors state that "[a] relative increase has been verified of the incidence of convulsions in the three first days that follow to the vaccination," id ., and that "[w]ith independence of the differences among vaccines of the diverse manufacturers ... sufficient experimental data exist to imply to the endotoxin and to the germ pertussis in the neurological adverse reactions to the pertussis vaccination." Id.
2.
Charlotte Dravet et al., Severe myoclonic epilepsy in infancy (Dravet Syndrome) , in Epileptic Syndromes in Infancy, Childhood and Adolescence 89-113 (J. Roger et al. eds., 4th ed. 2005).
The authors review the scientific literature and de-scribe "Dravet syndrome." They note that some studies have concluded that "in a significant number of SME cases a genetic aetiology is likely ...." Id . at 90. The authors report that many studies confirm that the syndrome does not manifest exclusively in individuals with the SCN1A mutation. Id . at 108. The authors discuss their attempts to understand the biophysical properties of SCN1A gene mutations and find phenotype/genotype correlations, and state that the relationship between genotype and phenotype is "complex." Id . at 91. The authors state that:
afebrile seizures usually occur in the context of a vaccination or of an infectious episode, or after a bath. Later on, they are associated with febrile seizures in 80 per cent of the patients. Nieto-Barrera et al. (2000) emphasized the coincidence between the first seizure and the DTP (diphtheria-tetanus-polio) vaccination.
Id. at 92.
3.
Samuel F. Berkovic et al., De-novo mutations of the sodium channel gene SCN1A in alleged vaccine encephalopathy : a retrospective study , 5 LANCET NEUROL . 488-92 (2006).
The authors state that "[v]accination, particularly for pertussis, has been implicated as a direct cause of an encephalopathy with refractory seizures and intellectual impairment." Id . at 488 (Summary). They trace the association with SCN1A mutations, and state that "[t]he mechanism by which SCN1A mutations cause SMEI is unknown." Id . at 491. The authors state that some patients with the SCN1A mutation may develop the syndrome without a vaccine trigger, and also state:
In the presence of SCN1A mutations, vaccination can still be argued to be a trigger for the encephalopathy, perhaps via fever or an immune mechanism.
*1367 Id. The authors state that this study was not designed to address that question.
4.
Anne M. McIntosh et al., Effects of vaccination on onset and outcome of Dravet syndrome: a retrospective study , 9 LANCET NEUROL. 592-98 (2010).
The authors, reviewing the scientific literature, state that about 70-80% of children with Dravet syndrome have the SCN1A gene mutation, and about 20-30% do not have the mutation. Id . at 592. They report that about one-third of children with Dravet syndrome exhibited onset in less than 3 days after vaccination. The authors state that "[v]accination might trigger earlier onset of Dravet syndrome in children who, because of an SCN1A mutation, are destined to develop the disease." Id . at 592.
5.
Blanca Tro-Baumann et al., A retrospective study of the relation between vaccination and occurrence of seizures in Dravet syndrome , 52(1) EPILEPSIA 175-78 (2011).
The authors state that for infants with SCN1A mutations,
epileptic seizures in the setting of fever are a clinical hallmark. Fever is also commonly seen after vaccinations and provocation of epileptic seizures by vaccinations in patients with Dravet syndrome has been reported, but not systematically assessed.
Id . at 175 (Summary). They report that "[t]he majority of seizures occurred after DPT vaccinations and within 72 h after vaccination." Id .
The authors state that seizures after vaccination are "a common feature in Dravet syndrome and emphasize the need for preventive measures for seizures triggered by vaccination or fever in these children." Id . at 175.
6.
Meral Özmen et al., Severe myoclonic epilepsy of infancy (Dravet syndrome): Clinical and genetic features of nine Turkish patients , 14(3) ANNALS OF INDIAN ACADEMY OF NEUROLOGY 178 (2011).
The authors studied patients having the SCN1A mutation, and discuss the complexities of the relation to vaccines. They summarize past studies, and state:
Sudden occurrence of seizures and developmental regression after the pertussis vaccine in previously healthy children may confound as that it may be related with vaccination. There are several reasons for seizures and developmental regression in infancy. Some of them were incorrectly identified as vaccine encephalopathies. However, later studies did not support the link between permanent brain damage and vaccines. On the other hand, similarities were observed between clinical progressions of SMEI and vaccine encephalopathy as more data was gained about special epilepsy syndromes like SMEI. Berkovic et al. detected SCN1A gene mutations in 11 out of 14 patients who were diagnosed with vaccine encephalopathy. It was reported that the cause of vaccine encephalopathy was not vaccination but rather the genetically determined age-specific epileptic encephalopathy. In our patients, convulsions started after whole cell pertussis vaccination. Similarly, recent data from a study by McIntosh et *1368 al. showed that 37 patients out of 40 in the co-hort had their first seizure after at least one DTP vaccination. They concluded that while the pertussis vaccine is a trigger for earlier onset of the disease, it does not affect its outcome.
J.A. 1310 (internal citations omitted). The authors conclude that:
Pertussis vaccination acts as a trigger for the onset of [SMEI]. Neuro-developmental delay and behavioral problems that appear after two years of age should be expected in all patients as long-term complications of the disease.
J.A. 1311.
7.
Nelia Zamponi et al., Vaccination and Occurrence of Seizures in SCN1A Mutation-positive Patients: A Multicenter Italian Study , PEDIATRIC NEUROLOGY xxx 1-5 (2013).
The authors acknowledge the controversy concerning the relation of vaccination to Dravet syndrome ("DS"), and consider whether vaccination should be withheld for infants with the SCN1A mutation. They state:
The relationship between vaccination and clinical evolution of SCN1A-mutated patients is still controversial. Moreover, the possible advantage to suspend vaccination route in these patients has not been addressed. Recently, some authors have argued that vaccination might trigger the onset of DS in patients carrying a genetic mutation because these patients are genetically inclined to developing the disease. However, according to these studies, vaccination does not seem to affect clinical outcome of DS and therefore it should not be withheld. In contrast, other authors have stated that vaccination, performed either before or after DS onset, might affect clinical outcome of these patients.
Id . at 2 (internal citations omitted). The authors are cautious about extrapolating vaccination recommendations from their results, although they state that "patients who experienced seizures close to vaccination had an earlier seizure onset and a higher frequency of status epilepticus during development." Id . at 4.
8.
Valentina Cetica et al., Clinical and Genetic Factors Predicting Dravet Syndrome in Infants with SCN1A Mutations , 88(11) NEUROLOGY 1037 (2017).
This is a study of 200 persons having the SCN1A mutation, wherein 97 had Dravet syndrome, including borderline forms, and 103 did not have the syndrome. All 200 subjects were more than 24 months of age, which is when Dravet syndrome can usually be diagnosed; the sample had an average age of 18.58 years.
Of these subjects, the relation of seizure occurrence to Dravet syndrome was analyzed, with 182 patients having had seizures as their presenting symptom. The authors report that "age at first seizure and frameshift mutations were associated with Dravet Syndrome. The risk of [developing] Dravet Syndrome was 85% [if the first seizure occurred] in the 0- to 6-month group, 51% in the 6- to 12-month range, and 0% after the 12th month."Id. at 1037. The authors report that: "None of the patients who experienced their first seizure after 12 months of age developed Dravet syndrome." Id . at 1040. Thus, "an older age at seizure onset represents a protective factor against the risk of developing Dravet syndrome." Id .
*1369 APPLICATION TO E.O.
The government's position is that "E.O.'s mutation is the sole cause of his Dravet syndrome and his resulting neurological condition." J.A. 2. Although the science is still evolving, it is apparent that this simplistic statement is incorrect.
All of the reported studies show a role of vaccination in producing seizures in infants with the SCN1A mutation. The Petitioners agree that there is a relationship between E.O.'s genetic mutation and his seizures and ensuing disabilities; they argue that "his DTaP vaccination in conjunction, with his SCN1A mutation ... likely caused his seizure disorder, encephalopathy, and developmental delays." Reply Br. 1.
It is not known whether E.O. would have manifested Dravet syndrome without the vaccination. The only certainty is that E.O. experienced a dramatic reaction within a few hours of DTaP vaccination, that the seizures continued, and that there were developmental consequences. The Special Master so acknowledged, but leaped to the conclusion that "[a]lthough E.O.'s vaccinations may have caused a fever or otherwise triggered his first seizure, neither that initial seizure nor his vaccinations caused his Dravet syndrome or neurological complications." Oliver v. Sec'y of Health & Human Servs. , No. 10-394V, 2017 WL 747846, at *2 (Fed. Cl. Feb. 1, 2017).
This conclusion does not withstand scrutiny. The scientific studies all show a reasonable likelihood that E.O.'s vaccination in his first 6 months triggered the adverse events he suffered. The seizures and fever on the evening of E.O.'s 6-month DTaP vaccination are recognized in the scientific literature as likely to have contributed to or triggered the Dravet syndrome in conjunction with the SCN1A mutation.
"Likelihood" is the standard of Vaccine Act recovery, for the Vaccine Act arose because certainty was not available. Until modern science discovered a genetic foundation for at least some vaccine injury, E.O.'s vaccine response would have been classified as a "Table Injury" and routinely entitled to the support of the Vaccine Act. Though science has begun to understand previously unexplained responses to vaccines, such understanding does not alter the Vaccine Act.
Until every infant is genetically analyzed before vaccination and all aberrant genes are identified, the Vaccine Act is the nation's response to potential vaccine-induced consequences such as Dravet syndrome. HHS is required to administer the Vaccine Act in accord with its text and purpose. From my colleagues' contrary ruling, I respectfully dissent.

Diphtheria-Tetanus-acellular Pertussis. J.A. 2.

The record states that E.O.'s parents do not have the mutation.

Congress recognized the consequences of government-mandated vaccination when it instituted a compensation scheme. See S. Hrg. 98-1060, at 5 (1984) ("In all of our States, vaccination is required before a child will be allowed to enter public school. Federal, State, and local government officials urge all parents to immunize their children. For all practical purposes, immunization pro-grams have become obligatory. Should a child sustain injury as a consequence of such an immunization pro-gram, it hardly seems fair that that child or its parents should sustain the entire burden of the consequences which may follow."). Congress was also well aware that the DTP vaccine could cause the injuries sustained by E.O. See S. Hrg. 98-350, at 1 (1983) ("The occurrence of occasional central nervous system reactions to pertussis vaccines is well-established, ranging from simple, short-lived convulsions to encephalopathy with permanent brain damage and, rarely, death.").

The Vaccine Act establishes a presumption of vaccine injury when fever and seizure occur within 3 days after immunization, 42 U.S.C. §§ 300aa-14(a) ; 14(b)(2).